**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **PATRICIA ELIZABETH SMEAL,** | : | |
| **Executrix of the Estate of GORDON CARL** | : | |
| **SMEAL, SR., Individually and in her own right,** | : | |
| | : | **CIVIL ACTION** |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | |
| | : | **NO.    19-5853** |
| **CLARK EQUIPMENT COMPANY, et al.** | : | |
| | : | |
| **Defendant.** | : | |

**<u>MEMORANDUM</u>**

**Goldberg,  J.**                                                                                    **April 28, 2022**


Decedent Gordon Carl Smeal, Jr.'s executrix, Plaintiff Patricia Elizabeth Smeal, commenced this action in state court against Defendants Clark Equipment Company ("Clark") and NACCO Material Handling Group n/k/a Hyster-Yale Group ("Hyster-Yale Group") alleging that Mr. Smeal developed mesothelioma due to his exposure to asbestos contained within forklift brake products manufactured by Defendants.  The case was removed to federal court and consolidated as part of a multi-district litigation with other pending asbestos cases for resolution of common matters.

Following discovery, Defendants moved for summary judgment alleging that Plaintiff had not produced sufficient evidence either of Mr. Smeal's exposure to an asbestos-containing product attributable to their companies or of causation between their products and Mr. Smeal's illness.  The case was reassigned to me for resolution of those motions.  For the following reasons, I will deny both Motions for Summary Judgment.

I.      **FACTUAL BACKGROUND**

For purposes of general background, the following facts are derived from the evidence submitted by the parties.  Where there is conflicting evidence about a particular fact, Federal Rule of Civil Procedure 56 requires that I take all facts and evidence in the light most favorable to the non-moving party.

A.  **Mr. Smeal's Deposition Testimony[1]**

After his service in the United States Navy, Mr. Smeal worked at the New Cumberland Army Depot for approximately thirty-two years between 1976 and 2008.  (Pl.'s Resp. to Clark Mot. Summ. J., Ex. A, Dep. of Gordon Smeal ("Smeal Dep.") 106:8–15; Pl.'s Resp. to Clark Mot. Summ. J., Ex. B, Video Dep. of Gordon Smeal ("Smeal Video Dep.") 20:17–21:3, 92:1–3.)  The New Cumberland Army Depot (the "Depot") is a government facility used to provides supplies around the world for troops and smaller supply depots.  (Smeal Video Dep. 24:12–17.)  During the relevant time period, forklifts were used extensively at the Depot.  (Id.; Smeal Dep. 230:4–25.)

Although Mr. Smeal worked for a few years as a laborer at the Depot, he eventually began working as a "tool and parts attendant," which entailed issuing parts and tools to mechanics and engineers.  Mr. Smeal described his job duties as: "issuing parts all the time, parts, parts.  And tools when they need tools to rip stuff apart.  Like a lot of the mechanics next door they'd need different parts if they broke something or they're putting brake shoes or brake drums or putting generators on, alternators.  Anything that has to do with forklifts."  (Smeal Dep. 106:16–108:16.)

---

[1]     Mr. Smeal gave both a  regular discovery deposition and a videotaped trial deposition.  This section summarizes all of his testimony.

Mr. Smeal was assigned to Building one, which contained a commissary, engineers, the tool and parts crib, mechanics, and a carpenter shop.  (Id. at 109:12–24.)  His workspace was a caged-up area with wide open wires and counter space approximately ten to fifteen feet away from where the forklift mechanics were sanding the brakes and using the air hoses to remove all of the dirt.  (Smeal Video Dep. 24:18–25:22.)  There were always twenty or more mechanics just next door to him because they had all different forklifts to service, including forklifts manufactured by Hyster, Clark, and Yale.  (Smeal Dep. 108:11–16, 114:19–115:2.)

Mr. Smeal testified that the Clark-manufactured forklifts had four pneumatic tires and were in operation "constantly."  (Id. at 375:2–376:14.)  He recalled the Clark forklifts being used at the Depot from the time he started until the day he left.  (Id. at 387:2–9.)  As these forklifts and accompanying brake parts needed to be serviced, Mr. Smeal regularly encountered Clark drum brakes, linings, and brake shoes.  (Id. at 377:12–378:22.)    He did not, however, assist with any mechanic or brake work on a Clark forklift.  (Id. at 385:3–7.)  Mr. Smeal also never saw the word "asbestos" on the forklift brake boxes stored in the parts department and had no personal knowledge of any of the brakes used on the forklifts.  (Id. at 402:16–19, 403:6–13.)  Rather, he based his assumption that the brakes contained asbestos on "common knowledge."  (Id. at 239:14–240:11.)

As to the Hyster and Yale forklifts, Mr. Smeal specifically remembered that they were yellow sit-down forklifts powered by gas/propane and electric, and with the manufacturer name labeled directly on them.  (Id. at 271:1–21.)  The Hyster and Yale forklifts were used at the Depot for moving all kinds of freight, and Mr. Smeal supplied drum brakes to the mechanics that worked on those forklifts.  (Id. at 273:12–274:23; 285:2–25.)

Plaintiff alleges that Mr. Smeal suffered multiple, distinct exposures to asbestos from both new and used brake and clutch components on these forklifts.  First, Mr. Smeal testified that he would have to unbox brake shoes and brake linings for Clark, Hyster, and Yale forklifts.  (Smeal Dep. 111:21–115:5.)  He was responsible for ordering a lot of the parts that were stocked and specifically recalled ordering from Hyster and Clark.  (Id. at 121:12–122:19.)  When the parts would come in, there would be dust on and in the boxes.  (Id. at 116:16–20, 177:6–11.)  He opened up the boxes, removed the brakes to ensure everything was included, closed them back up, and handed the boxes to the mechanic.  (Smeal Video Dep.  27:3–28:12.)

Second, Mr. Smeal testified that he was exposed to asbestos from the work performed by the mechanics when they removed and replaced forklift brakes and closures.  Mr. Smeal indicated that the mechanics were located in two to three bays in Building One, which were approximately fifteen feet away from where he was located.  (Smeal Dep. 113:9–24.)  The mechanics would rip stuff apart, do brake jobs, sand brakes, create "all kinds of dust and dirt," and "[b]low[] stuff all over."  (Id. at 114:1–11.)  New forklift brakes were sanded down to remove their glazing, and the mechanics would use air hoses to blow off the parts on every single forklift, which regularly caused dust to come into his area.  (Id. at 117:3–21, 451:12–19.)  Mr. Smeal specifically recalled exposure to the Clark, Hyster, and Yale forklift parts.  (Id. at 278:6–281:7, 282:15–286:25, 383:19–24.)  At the end of the day, the mechanics would clean up with brooms, pans, and air hoses, again creating dust in Mr. Smeal's area.  (Id. at 451:12–352:12.)    The forklift-specific bay was the one located right next to Mr. Smeal, and the tool and parts room and the forklift area were partly separated by a wall.  (Id. at 114:16–18, 229:9–13.)  From his vantage point in the tool and parts department, Mr. Smeal could observe what the forklift mechanics were doing.  (Smeal Video Dep. 25:9–22; Smeal Dep. 447:17–25.)  Oftentimes, Mr. Smeal would have to go through the mechanics area to

4

access the office containing paperwork he needed.  (Id. at 248:3–10.)  Both Mr. Smeal and the mechanics would work eight hours a day, five days a week.  (Id. at 448:2–12.)

Third, Mr. Smeal testified that he personally swept up the dust created by the mechanics from his own area.  (Id. at 452:5–12.)  He would also clean up the dust caused by opening packages and handing stuff to different mechanics.  (Smeal Video Dep. 30:8–31:3.)

Fourth, Mr. Smeal explained that he handled old parts that came into the Tool and Parts Division.  (Smeal Dep. 118:9–11.)  A lot of the old parts would go into a Tri-Wall, and Mr. Smeal would have to go through those parts to prepare paperwork and ready them for shipping elsewhere. (Id. at 118:12–120:4.)

Finally, Mr. Smeal noted that he was in an area with nine other tool and parts attendants who did the same work.  As such, he was exposed to whatever dust they generated.  (Id. at 120:5–121:12.)

### B.  Publicly-Available Documents about the Forklifts at the Depot

Publicly-available Army documents confirm that the Depot had a massive forklift fleet. An August 1978 report entitled Truck, Forklift, Gasoline-Engine-Drive, 4000-Pound-Capacity, Pneumatic-Tired—User Survey noted that, "in May 1976, the Office of Management and Budget directed the Government to emphasize the acquisition of commercial, off-the-shelf products in order to achieve optimal effectiveness in the supply support operations.  The resulting emphasis on procurement of commercial items included forklift trucks used by the Army."  (Pl.'s Resp. to Clark Mot. Summ. J., Ex. C)  It further stated that "[t]he Army presently has an inventory of approximately 1750, 4000-pound-capacity, pneumatic-tired, forklift trucks which can be considered as candidates for replacement," and it identified Clark and Hyster forklifts as two of four brands of commercial forklifts that could meet this requirement across all of the Army's needs.

The report stated that the forklift characteristics were "acceptable to the Army and the risk is low to proceed with material acquisition of any of these trucks." (Id.)

A Report from the U.S. General Account Office to the Secretary of Defense dated June 1986 confirmed that, between 1979 and 1984, New Cumberland Army Depot spent $1 million to acquire forklifts and stock selector vehicles. (Pl.'s Resp. to Clark Mot. Summ. J., Ex. D.) The report indicated that the U.S. Army Material Command advised that these forklifts "would continue to be used both within and outside the distribution centers once the new centers became operational." (Id.)

## C. Defendants' Admissions in Other Asbestos Litigation

### 1. Clark Forklifts

Defendant Clark's corporate representative, Kenneth Priebe, acknowledged that (a) all Clark forklifts utilized asbestos brakes in the 1952 through the 1980s, (b) these brakes were items Clark knew needed to be replaced, and (c) Clark directly supplied the aftermarket components to its customers. (Pl.'s Resp. to Clark Mot. Summ. J., Ex. G, Dep. of Kenneth Priebe ("Priebe Dep.") 47:13–49:2.) Mr. Priebe testified that he did not know of any non-asbestos, aftermarket brakes that met all of Clark's requirements. (Id.) According to a Material Safety Data Sheet, Clark's forklift friction components were made of asbestos at least through 1989.[2] (Pl.'s Resp. to Clark

---

[2]    Clark contends that this Material Safety Data Sheet marked as Plaintiff's Exhibit H was prepared by the Department of Defense and not by Clark. Accordingly, Clark asserts that the document is inadmissible hearsay, and, in any event, the accuracy cannot be confirmed.

In the Third Circuit, hearsay can be considered on a motion for summary judgment if it is capable of admission at trial. Stelton v. Univ. of Medicine & Dentistry of NJ, 223 F.3d 220, 223 n.2 (3d Cir. 2000). The document appears to be a public record, admissible under Fed. R. Evid. 803(8), as it was prepared by the Department of Defense and sets out the office's activities. See Coleman v. Home Depot, Inc., 306 F.3d 1333, 1343 n.5 (3d Cir. 2002) (noting that investigative reports made by government agencies are removed from the rule against hearsay unless the party opposing the admission proves the report's untrustworthiness). Because this evidence is capable of being admitted at trial, I will consider it here.

Mot. Summ. J., Ex. H.)  Mr. Priebe, however, also remarked that if a replacement brake came from a third party, he did not know whether that brake would contain asbestos.  (Priebe Dep. 49:3–25.)

Clark published its own "Parts Manuals" for its forklifts, which advised customers to order parts based on the forklift serial and parts numbers.  (Pl.'s Resp. to Clark Mot. Summ. J., Exs. I, J.)  These parts included brakes, discs, and brake lining kits.  (Pl.'s Resp. to Clark Mot. Summ. J., Ex. I.)  The "Overhaul Manual" for a Clark "OH-339, C500" forklift advertised that "[t]he mechanic is told to always use the Genuine Clark Parts when replacements are needed.  'Look alike' parts from other suppliers never work as well as the original parts."  (Pl.'s Resp. to Clark Mot. Summ. J., Ex. K.)

2.  Hyster and Yale Forklifts

Defendant Hyster-Yale Group, through its corporate representative, David Romero, admitted that all forklift brakes incorporated into Hyster and Yale forklifts in the 1960's through the 1980's contained asbestos.  (Pl.'s Resp. to Hyster-Yale Mot. Summ. J., Ex. I, David Romero Dep. ("Romero Dep.") 79:11–80:1.)  Defendant Hyster-Yale Group also admitted that it sold "after-market replacement parts" for its forklifts.  (Pl.'s Resp. to Hyster-Yale Mot. Summ. J., Ex. H, Response to Interrogatory 14.)  This is a practice still employed by Hyster-Yale today.  (Pl.'s Resp. to Hyster-Yale Mot. Summ. J., Ex. J.)  Hyster-Yale Group concedes that continued to incorporate asbestos components into its forklifts until 1991.  (Pl.'s Resp. to Hyster-Yale Mot. Summ. J., Ex. H.)

**D.  Expert Testimony**

In support of causation, Plaintiff has produced an expert report from epidemiologist Dr. Jacqueline Moline.  Dr. Moline's report describes the frequency and regularity with which Mr. Smeal was exposed to asbestos from Hyster, Yale, and Clark forklifts, among others.  (Pl.'s Resp.

to Clark Mot. Summ. J., Ex. L.)  Based on Mr. Smeal's description of his exposure to asbestos-laden dust from each of the forklift manufacturers over the course of twelve to thirteen years, Dr. Moline opines, to a reasonable degree of medical certainty, that Mr. Smeal's regular and frequent exposure to asbestos from Clark, Hyster, and Yale forklifts and aftermarket components was a substantial causative factor in the development of his mesothelioma and would be sufficient, in and of itself, to have caused his disease.  (Id.)

Clark provides a contrary expert report from Gayla McClusky, a certified industrial hygienist, who opines that Plaintiff's evidence fails to demonstrate that Mr. Smeal's exposure to asbestos at the Depot was any different than general cumulative background levels.  Stated differently, she posits that Dr. Moline failed to demonstrate that Mr. Smeal's exposure level, if any, was any greater than the acknowledged "background level" experienced in the general atmosphere.  She goes on to conclude that "Mr. Smeal's exposure, if any, to asbestos originating in these products would not have increased his risk of developing asbestos-related disease." (Clark's Mot. Summ. J., Ex. D.)

Clark also offers a report Dr. Brian Taylor, a pulmonologist, who opines that Mr. Smeal's mesothelioma was caused by his substantial exposure to asbestos during the course of his service in the U.S. Navy and during his civilian employment as an insulator at commercial websites. (Clark's Mot. Summ. J., Ex. E.)  Dr. Taylor also concludes that Mr. Smeal's exposure to asbestos in the brake products associated with forklifts was *de minimis* and did not cause or contribute to his development of mesothelioma.  (Id.)

### G.   Procedural History

After being diagnosed with malignant mesothelioma in January 2018, Mr. Smeal filed this case in New York City's Asbestos Litigation on May 4, 2018.  Given his condition, Mr. Smeal

was granted accelerated trial preferences, and his discovery deposition was conducted over the course of seven days between October 3, 2018 and October 25, 2018. His videotaped preserved trial testimony was given on March 15, 2019. On August 10, 2019, Mr. Smeal passed away.

Defendants were dismissed from the New York action for lack of personal jurisdiction. As such, on June 21, 2019, Plaintiff—Mr. Smeal's executrix—filed suit in the Philadelphia Court of Common Pleas. The case was removed to federal court under both diversity and federal question jurisdiction and consolidated with an asbestos multi-district litigation pending here. No additional depositions were taken since that removal.

## II.   STANDARD OF REVIEW

Federal Rule of Civil Procedure 56 states, in pertinent part:

> A party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. The court should state on the record the reasons for granting or denying the motion.

Fed. R. Civ. P. 56(a). "Through summary adjudication, the court may dispose of those claims that do not present a 'genuine dispute as to any material fact' and for which a jury trial would be an empty and unnecessary formality." Capitol Presort Servs., LLC v. XL Health Corp., 175 F. Supp. 3d 430, 433 (M.D. Pa. 2016). A factual dispute is "material" if it might affect the outcome of the suit under the applicable law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). An issue is "genuine" only if there is a sufficient evidentiary basis that would allow a reasonable fact-finder to return a verdict for the non-moving party. Id.

The initial burden is on the moving party to adduce evidence illustrating a lack of genuine, triable issues. Hugh v. Butler Cty. Family YMCA, 418 F.3d 265, 267 (3d Cir. 2005). Once the

moving party satisfies its burden, the non-moving party must present sufficient evidence of a genuine issue in rebuttal.  Santini v. Fuentes, 795 F.3d 410, 416 (3d Cir. 2015).  The court must resolve all doubts as to the existence of a genuine issue of material fact in favor of the non-moving party.  Saldana v. Kmart Corp, 260 F.3d 228, 232 (3d Cir. 2001).  Unsubstantiated arguments made in briefs are not considered evidence of asserted facts.  Versarge v. Twp. of Clinton, 984 F.2d 1359, 1370 (3d Cir. 1993).

## III.   DISCUSSION

A federal court sitting in diversity is "required to apply the substantive law of the state whose laws govern the action."  Robertson v. Allied Signal, 914 F.2d 360, 378 (3d Cir. 1990). The parties agree that Pennsylvania substantive law applies.

Before imposing liability on a defendant in a product liability action, Pennsylvania law requires a plaintiff to show not only that the plaintiff was exposed to a defective product manufactured or sold by the defendant, but that the plaintiff's exposure was a substantial factor in causing the plaintiff's injury.  Gay v. A.O. Smith Corp., No. 19-cv-1311, 2021 WL 1663784, at *2 (W.D. Pa. Apr. 28, 2021) (citing Gregg v. V-J Auto Parts Co., 942 A.2d 216, 224–26 (Pa. 2007)).  The Pennsylvania Supreme Court has held that in the context of asbestos litigation, "it is appropriate for courts, at the summary judgment stage, to make a reasoned assessment concerning whether, in the light of the evidence concerning frequency, regularity, and proximity of a plaintiff's or decedents asserted exposure, a jury would be entitled to make the necessary inference of a sufficient causal connection between defendant's product and the asserted injury."  Gregg, 943 A.2d at 227.  The court has a "duty to prevent questions from going to the jury which would require it to reach a verdict based on conjecture, surmise, guess or speculation."  Krauss v. Trane, 104 A.3d 556, 568 (Pa. Super. 2014) (citation omitted).  Trial courts are to evaluate and "distinguish[]

cases in which the plaintiff can adduce evidence that there is a sufficiently significant likelihood that the defendant's product caused his harm, from those in which such likelihood is absent on account of only casual or minimal exposure to the defendant's product." Rost v. Ford Motor Co., 151 A.3d 1032 (Pa. 2016) (citing Gregg, 943 A.2d at 225).

Under these standards, both Defendant Clark and Defendant Hyster-Yale Group put forth two arguments in favor of their motions for summary judgment.  First, Defendants contend that Plaintiff has failed to produce sufficient evidence demonstrating that Mr. Smeal was ever exposed, with the requisite proximity, regularity, and frequency, to an asbestos-containing product attributable to their companies.  Second, Defendants assert that Plaintiff has failed to produce adequate expert evidence of causation.

### A.      Frequent, Regular, and Proximate Exposure to Defendants' Asbestos-Containing Products

"[A]t the heart of an asbestos case is at least product identification—that is, a plaintiff cannot triumph against a manufacturer unless he shows that the victim came across the manufacturer's product and that the product caused his injury." Mehnert v. Agilent Techs., Inc., No. 18-cv-893, 2020 WL 1493542 (W.D. Pa. Mar. 27, 2020) (quoting Walker v. Blackmer Pump Co., 367 F. Supp. 3d 360, 372 (E.D. Pa. 2019)).  Such an inquiry is "fact-intensive." Id.  For a plaintiff to defeat a defendant's motion for summary judgment, the plaintiff must show not only that he was exposed to asbestos-containing products with sufficient proximity, regularity and frequency to cause his injuries, but also that the asbestos products to which the plaintiff claims exposure were manufactured, distributed or sold by the defendant. Eckenrod v. GAF Corp., 544 A.2d 50, 53 (Pa. Super. Ct. 1988); see also Wilson v. A.P. Green Indus., 807 A.2d 922, 924 (Pa. Super. 2002) ("[A] plaintiff's evidence of exposure and product identity must show that she 'worked, on a regular basis, and in physical proximity with the product, and that [her] contact with

it was of such a nature as to raise a reasonable inference that [s]he inhaled asbestos fibers that emanated from it.'") (quotation omitted).

The nexus between a specific asbestos product and a plaintiff's medical condition may be supplied by a variety of direct and circumstantial evidence. Lilley v. Johns–Manville Corp., 408 596 A.2d 203, 207 (Pa. Super. Ct. 1991). "The testimony of any witness with knowledge regarding the plaintiff's workplace and his or her exposure to a defendant's asbestos-containing products is admissible when probative." Id. Application of the "frequency, regularity, and proximity" test should become "somewhat less critical" where the plaintiff puts forth specific evidence of exposure to a defendant's product. Gregg, 943 A.2d at 225 (citing Tragarz v. Keene Corp., 980 F.2d 411, 421 (7th Cir. 1992)).

### 1.    Defendant Clark

Defendant Clark does not appear to contest the fact that its forklifts and related brake parts were in fact used extensively at the Depot. Rather, Clark's argument posits that: (a) Plaintiff has failed to produce evidence of record that any of the brakes or clutches used on Clark forklifts at the New Cumberland Depot ever contained asbestos, and (b) Plaintiff has failed to establish the frequency, regularity, and proximity of Mr. Smeal's contact with the asbestos-containing product.

According to Clark, Mr. Smeal admitted that he had no personal knowledge as to the composition of the brake or clutch materials, none of the Clark parts stored in the Tool & Parts Department were labeled as containing asbestos, and he never saw any writing on the boxes or the components themselves to indicate their composition. (Smeal Dep. 402 16–19, 403:6–13.) Rather, Mr. Smeal confirmed that his only basis for assuming they contained asbestos was "common knowledge." (Id. at 239:14–240:11.)

Under Pennsylvania law, such "common knowledge" is insufficient for surviving summary judgment.  In <u>Gibson v. Workers' Comp. Appeal Bd.</u>, 861 A.2d 938 (Pa. 2004), the Pennsylvania Supreme Court stated the following with regard to lay witness opinions as to the presence of asbestos:

> Where . . . a party proffers a witness expressing an opinion on matters such as the presence of asbestos in the workplace, the trial court must be rigorous in assuring that the lay witness satisfies the strictures of Rule [of Evidence] 701.  In particular, the proponent of technical lay opinion testimony must show that the testimony is based on sufficient personal experience or the specialized knowledge of the witness. Pa. R. E. 602 . . . . Without meeting the requirements of Rule 701, the lay opinion is not "rationally based on the perception of the witness" or truly "helpful" to the jury.

<u>Id.</u> at 945; <u>see also</u> <u>Krauss v. Trane U.S. Inc.</u>, 104 A.3d 556, 567–68 (Pa. Super. 2014) (lay witness's statements that certain factory equipment contained asbestos were not based on actual knowledge, only a presumption and belief that these products contained asbestos.  "Such statements are insufficient to show that there exists a genuine issue of fact as to the existence of asbestos in these products.").  As Mr. Smeal has no actual knowledge or observation of the asbestos, his testimony cannot create a genuine issue of material fact.

Nonetheless, Plaintiff also cites to videotaped deposition of Kenneth Priebe, a representative of Clark, given during an unrelated case brought by different asbestos-liability plaintiffs.[3]  Mr. Priebe testified that:

---

[3]     Clark cites <u>Krauss v. Trane U.S., Inc.</u>, 104 A.3d 556, 570 (Pa. Super. Ct. 2014) for the proposition that interrogatory answers from unrelated litigation, which established only that defendant company manufactured numerous products that may or may not have contained asbestos, fail to establish that the turbines at the worksite where plaintiff was allegedly exposed contained asbestos.  Unlike in <u>Krauss</u>, however, where there was no evidence that the turbine products at the worksite contained asbestos, the deposition testimony here is that Clark replacement brake linings through 1989 all contained asbestos.  Accordingly, I find this case inapposite.

Q.      Clark Equipment sold replacement parts for its forklift trucks, correct?

A.      Yes.

. . .

Q. . . . Among the replacement parts that Clark Equipment sold included replacement brake linings for its forklift trucks, correct?

A.      Yes.

Q.      And when Clark sold replacement parts, including the brake linings, it would sell the same parts as were on the original forklift truck when Clark Equipment manufactured it, correct?

. . .
A.      As far as I know, they supplied basically the same parts that were put on the original trucks.

Q.      And the whole idea is that, as you mentioned before, all the different characteristics that went into getting the right kind of braking system, the physical space of the brake, the life, the noise, you wanted to have all these same characteristics in the replacement parts?

A.      That's right.

. . .

**Q.      And are you aware of any non-asbestos brakes that met all those requirements in the '50s, '60s, '70s or '80s?**

**A.      No, I don't.  If they were available, I'm not aware of them.  And I—there are a lot of things that I still don't—you know, that have disappeared from my brain because it's been replaced by something else.**

Q.      Right.  And Clark was aware that the brakes are a wear item that need service, maintenance, and ultimately replacement?

A.      Yes.

Q.      And those replacements, Clark would like those replacements to come from Clark or its dealers, correct?

14

A.      Yes.

Q.      And either way, whether they came—the replacements came
from Clark or one of Clark's dealers or some third-party, it was
inevitable that the replacement brake would also be an asbestos
brake, correct?

A.      I have no knowledge that that was asbestos brakes, so I—

Q.      Well, certainly if somebody bought the replacement part
from Clark, it would be the same one?

A.      Yeah.  But I don't know whether that was an asbestos brake
or what was in that brake, so—

Q.      That's what I'm saying, so let me take a step back.  If the
original—we talked about which ones had the asbestos brakes.  If
the original forklift truck had an asbestos brake, then the
replacement would, too?

A.      Yeah.  But we don't know whether they bought that brake
from Clark to service the product.

Q.      Right.  It could have come from someone else?

A.      The very competitive market, the replacement business.

Q.      Okay.  It would have to fit physically on the Clark forklift,
correct?

A.      Definitely.

(Preibe Dep. 47:2–49:25 (emphasis added).)[4]

Such evidence is sufficient to create a genuine issue of material fact as to whether the

specific Clark products used at the New Cumberland Depot contained asbestos.  Mr. Priebe

---

[4]    Defendant Clark argues that reading the testimony in its entirety, "it certainly does not
definitively conform that all forklift brakes contained asbestos at all times up to 1989." (Clark
Reply Br. 4.)  I disagree with this characterization.  Mr. Priebe explicitly testified that he was not
aware of any non-asbestos brakes manufactured by Clark up to 1989, other than a speculative
possibility that they existed and he just did not know about them.  While he did acknowledge that
a Clark forklift could contain a non-Clark brake, Plaintiff here specifically identified receiving and
handling Clark brakes.

explicitly testified that, to his knowledge, all Clark brakes manufactured from the 1950s through the 1980s contained asbestos. Mr. Smeal affirmatively stated that he encountered Clark drum brakes while at the Depot and was responsible for ordering many of these parts. (Smeal Dep. 112:1–14, 114:19–115:2, 122:7–19, 377:12–378:14, 379:14–24.) In the face of this evidence, and despite its unique access to information regarding the makeup of its parts, Clark has presented no evidence to the contrary.

Moreover, I find that Plaintiff has adduced sufficient evidence of the frequency, regularity, and proximity of Mr. Smeal's exposure to the Clark brakes and resulting asbestos dust. As noted above, "in order for a plaintiff to defeat a motion for summary judgment, a plaintiff must present evidence to show that he inhaled asbestos fibers shed by the specific manufacturer's product." Eckenrod v. GAF Corp., 544 A.2d 50, 54 (Pa. Super. Ct. 1988) "The mere fact that [a defendant's] asbestos products came into the facility does not show that the decedent ever breathed these specific asbestos products or that he worked where these asbestos products were delivered." Id. However, proof that a plaintiff regularly worked in the vicinity of that product's use and was exposed to the products may suffice. Lilley v. Johns-Manville Corp., 596 A.2d 203, 207–08 (Pa. Super. Ct. 1991).

Mr. Smeal testified that, over the course of his thirty-year employment at the Depot, he would have to unbox brake shoes and brake linings for Clark, Hyster, and Yale forklifts and would often see dust on the boxes. (Id. at 111:21–115:5, 116:16–20, 177:6–11, 121:12–122:19.) He specifically recalled handling drum brakes from Clark, and mechanics would ask him to supply Clark parts for the forklifts. (Smeal Dep. 377:25–379:24, 382:3–16.) Moreover, Mr. Smeal explained that the mechanics were located in two to three bays in Building One, which were approximately ten to fifteen feet away from where Mr. Smeal was located, and the mechanics

would rip stuff apart, do brake jobs, sand brakes, create "all kinds of dust and dirt," and "[b]low[]

stuff all over." (Id. at 113:9–114:11, 117:3–21, 451:12–19.) From his vantage point in the tool

and parts department, Mr. Smeal could observe what the forklift mechanics were doing, (Smeal

Video Dep. 25:9–22), and the opening between the sections was so big that a truck could be driven

through it. (Smeal Dep. 447:17–25.) He often observed the mechanics making adjustments on

the brakes—including sanding, cleaning, and air hosing—for Clark forklifts. (Smeal Dep. 383:19–

24.) Mr. Smeal also testified that he personally swept up the dust both created by the mechanics

and from his opening of the packages. (Smeal Dep. 452:5–12; Smeal Video Dep. 30:8–31:3.)

I find such evidence sufficient to create a genuine issue of material fact regarding Mr.

Smeal's frequent, regular, and proximate exposure to asbestos-containing Clark parts. See, e.g.

Weible v. Allied Signal, Inc., 963 A.2d 521, 534 (Pa. Super. 2008) (reversing grant of summary

judgment where the product identification witnesses in that case demonstrated an ability to call up

specific recollection of the brake and clutch products at issue and where co-workers testified that

they used the asbestos-containing products); Wright v. Allied Signal, Inc., 963 A.2d 511, 520 (Pa.

Super. 2008) (reversing summary judgment where evidence established that defendant's product

was frequently used in plaintiff's plant, that plaintiff regularly worked in proximity to that product,

and that plaintiff's contact with the product was of a nature to give rise to a reasonable inference

that he inhaled asbestos fibers from the product); Gutteridge v. A.P. Green Servs., Inc., 804 A.2d

643, 659–60 (Pa. Super. 2002) (reversing grant of summary judgment where decedent's co-

workers testified that decedent worked at Reading Terminal in close proximity to locations at

which asbestos dust was produced from products manufactured by the defendants).

Clark argues that Plaintiff failed to "establish the number of times any brake or clutch work

was performed on a Clark forklift, or how many times Mr. Smeal may have been in the facility

when a Clark forklift was worked on." (Def. Clark's Mot. Summ. J. 12). Such "pinpoint precision in proofs" in proofs is not required. Weible, 963 A.2d at 534. It is sufficient that, based on this evidence, a jury could make the necessary inference of a sufficient causal connection between the Defendant's product and the asserted injury. While a jury need not make that inference, and a contrary inference is at least possible, "the parsing of possible or plausible contrary inferences that might be drawn from the evidence is not the quintessence of summary judgment; it is the embodiment of a trial." Wright, 963 A.2d at 521.

> 2.   Defendant Hyster-Yale Group

Hyster-Yale Group likewise contends that Plaintiff has not produced sufficient evidence demonstrating that Mr. Smeal was ever exposed to an asbestos-containing product attributable to Hyster or Yale forklifts.

As with Clark, I find that a genuine issue of material fact remains on this point. In a 2011 deposition in a New Jersey Superior Court asbestos lawsuit, Cortelyou v. NACCO Materials Handling Corp., et al., No. MID-4118-10AS (N.J. Super.), the Hyster-Yale Group's corporate designee, David Romero, testified as follows:

> Q.   To your knowledge, what were the capacity ranges of the forklifts manufactured by Yale from the 1960's through the 1980's, what was the low end?
>
> A.   We would have a 3,000-pound truck, and it would go up to 15,000 pounds capacity.
>
> Q.   Now, is it fair to say that **all the forklifts manufactured by Yale in the '60s, '70s and '80s had brake systems?**
>
> A.   **Yes, sir.**
>
> Q.   Okay. Is it fair to say that **all the brakes had asbestos in them based upon your information now**, not what you knew then?
>
> . . .

A.      Are we talking the '60s, '70s, '80s?

Q.      Yes, '60s, '70s and the early '80s.

A.      **Because it was our knowledge from the suppliers that they contained asbestos, yes, sir.**

(Pl.'s Resp. to Hyster-Yale Mot. Summ. J., Ex. I, 79:9–80:1 (emphasis added).)[5]  In the face of this admission, Hyster-Yale Group produced no contrary evidence that any of the forklifts or aftermarket brake parts it manufactured during the relevant time period did not contain asbestos.

Moreover, Mr. Smeal testified that the Depot had Hyster and Yale forklifts and that he was exposed to the asbestos dust from Hyster and Yale brakes with regularity and frequency.  (Smeal Dep. 108:13–16.)  Mr. Smeal specifically recalled ordering parts for Hyster and Yale forklifts.  (Id. 111:25–112:14, 122:11–16, 271:1–3, 274:14–276:16; Smeal Video Dep. 22:6–10.)  Mr. Smeal also recalled seeing the mechanics perform work on Hyster and Yale parts and remembered them sanding down Hyster and Yale brakes.  (Smeal Dep. 114:19–116:15, 117:15–21, 282:15–7.)  Finally, Mr. Smeal described handling the brake products provided to the mechanics for their use on Hyster and Yale forklifts.  (Smeal Dep. 279:2–280:24, 284:9–14; Smeal Video Dep. 25:23–27:15.)

Like Clark, Hyster-Yale Group criticizes Plaintiff's inability to remember details such as how many Hyster or Yale forklifts were at the Depot when he started or the model names or serial numbers for any of the Hyster or Yale forklifts.  Failure to recall such details, however, does not

---

[5]      Hyster-Yale argues that Mr. Smeal was not able to identify the manufacture year, make or model number of the Hyster forklifts or Yale forklifts he observed and, as such, the prior testimony of Mr. Romero has no bearing on the case.  I disagree.  Mr. Romero testified that all Yale forklifts manufactured in the '60s, '70s, and '80s had brake systems and that all of the brakes had asbestos in them.  Accordingly, Mr. Smeal's inability to identify a specific make or model of a forklift is irrelevant.

undermine Mr. Smeal's testimony that he was regularly and repeated exposed to work on Hyster or Yale parts that contained asbestos.  As discussed in detail above with respect to the Clark parts, I find that Mr. Smeal's description of his proximity to the mechanics' work on these brake parts, combined with his own handling of the brake parts is sufficient to create a genuine issue of material fact regarding Mr. Smeal's frequent, regular, and proximate exposure to asbestos-containing Hyster and Yale parts.

B.     **Causation**

Alternatively, Defendants argue that Plaintiff has failed to provide sufficient expert evidence to demonstrate causation.

In <u>Rost v. Ford Motor Co.</u>, 151 A.3d 1032 (Pa. 2016), the Pennsylvania Supreme Court enumerated "two basic precepts" regarding expert causation testimony.  <u>Id.</u> at 1044.  "First, expert testimony based upon the notion that 'each and every breath' of asbestos is substantially causative of mesothelioma will not suffice to create a jury question on the issue of substantial factor causation."  <u>Id.</u>  "Second, to create a jury question, a plaintiff must adduce evidence that exposure to defendant's asbestos-containing product was sufficiently 'frequent, regular, and proximate' to support a jury's finding that defendant's product was substantially causative of the disease."  <u>Id.</u>  Where there is exposure to multiple sources of asbestos that satisfy the "frequency, regularity, and proximity" test, when "coupled with competent medical testimony establishing substantial factor causation, it is for the jury to decide the question of substantial causation."  <u>Id.</u>  Plaintiffs have no obligation to eliminate every other potential cause of the disease.  <u>Id.</u>  Ultimately, where an expert opines within a reasonable degree of medical certainty that the exposures by the defendant products were sufficient, in and of themselves, to cause the disease, comparison of the plaintiff's other occupational exposures is unnecessary.  <u>Id.</u> at 1048–49.

Here, Plaintiff's expert, Dr. Moline opined, to a reasonable degree of medical certainty, that Plaintiff's exposure to asbestos-containing products—in the Navy, in his prior employment, and for decades thereafter at the Depot—led to the development of his mesothelioma. Considering scientific and medical literature, Dr. Moline concluded:

> Mr. Smeal had regular and frequent exposure to friction materials during his working career, initially at Selecto Flash and then working for years at the New Cumberland Army Depot. In both cases, Mr. Smeal worked in areas where others were installing brakes, as well as removing and replacing brakes. He had to provide brake and clutch linings to the mechanics as part of his regular duties. Asbestos levels have been measured during brake and clutch work that are associated with the subsequent development of disease. For example, Anderson et. al. in 1973 (Society of Automotive Engineers, Pub no. 730549) found concentrations of asbestos as high as 29 f/cc at distances five feet away from the brake drums. The US Environmental Protection Agency in 1986 (EPA-560-OPTS-86-002, June) found that grinding used brake block linings can release 7 fibers/cc and beveling new linings can release up to 72 fibers/cc. Even light grinding of new linings released asbestos fibers at concentrations of 4.8 fibers/cc. Rohl et al found that asbestos levels from blowing dust from brake drums using compressed air led to asbestos levels between 6/6 f/cc to 29/8 f/cc. Lorimer et al. measured airborne asbestos levels after compressed air was used to clean out the brakes. **Asbestos was present not just in the breathing zone at the site of the brake, but Lorimer et al. measured asbestos 5-10 feet away, and found levels between 2.0 – 4.2 f/cc. This is similar to the exposures Mr. Smeal would have encountered.** Hickish and Knight measured asbestos after compressed air was applied to blow out a clutch assembly, and found asbestos in the air at concentrations of 2.25 f/cc. Atkinson noted that dust samples in clutch and brake boxes ranged from 15-55%. There were 2.2 to 641.9 billion asbestos structures measured in the boxes.

(Pl.'s Resp. to Clark Mot. Summ. J., Ex. G (emphasis added).)[6]

---

[6]    In the response to both Defendants' Motions for Summary Judgment, Plaintiff attaches an affidavit from Dr. Moline, dated September 8, 2021, which purports to supplement her expert report and address deficiencies identified by Defendants in their Motions. I decline to consider this affidavit. Under the Court's February 4, 2021 Case Management Order, all expert reports were to be served by March 8, 2021. Plaintiff has never sought leave to supplement Dr. Moline's

Defendants now contend that Dr. Moline's report is insufficient to establish causation because she opines only as to the release of fibers after brake and clutch work and fiber concentration in the breathing area where the brake and clutch work are actually performed. Defendants go on to posit that the additional studies cited by Dr. Moline regarding the fiber concentration at certain distances measured airborne asbestos levels in areas five to ten feet away. According to Defendants, Dr. Moline fails to identify any studies, observations, or other scientific methodologies that address the expected level of exposure at a distance of more than ten feet away from the mechanic work. Because Mr. Smeal testified that his work area was ten to fifteen feet away from the mechanics' work area, Defendants contend that Dr. Moline's report does not create an issue of fact as to causation.

Defendants' argument unnecessarily splits hairs. In at least one of the studies cited by Dr. Moline, the air was measured five to ten feet away from the site of where the brake work was actually performed, and asbestos levels were found to be at sufficient concentrations to cause problems. Mr. Smeal's testimony as to his proximity to the brake work overlaps this distance. In his videotaped deposition, Mr. Smeal testified that he was in a "caged-up area" that was "*fifteen, ten* feet away from the mechanics." (Smeal Video Dep. 24:23–25:8 (emphasis added); see also Smeal Dep. 114:16–18 (forklift bay was right next to Mr. Smeal's work area).) Moreover, according to Mr. Smeal's testimony, the mechanics would use air hoses to blow off the parts on every single forklift, which caused dust to come directly into his area on a regular basis. (Smeal Dep. 114:1–11, 117:3–21, 451:12–19.) The mechanics would also clean up with air hoses, all creating dust in in Mr. Smeal's area. (Id. at 451:12–352:12.) Mr. Smeal also testified that he had

---

report, and consideration of it at this juncture, in response to the motion for summary judgment, would unfairly prejudice Defendants.

to go through the mechanics area to access the office containing paperwork he needed, thereby bringing him even closer to the alleged asbestos.  (Id. at 248:3–10.)  Finally, Mr. Smeal remarked that he unboxed brake shoes and brake linings for forklifts in his own work areas and, in doing so, he was exposed to dust on and in the boxes.  (Smeal Dep. 111:21–115:5, 116:16–20, 177:6–11.)

Reading Dr. Moline's report both in the context of Mr. Smeal's testimony and in the light most favorable to Plaintiff, I find that Plaintiff has produced sufficient evidence of causation.  Dr. Moline opined that a ten-foot proximity from the "breathing zone" of such asbestos activities—as opposed to ten feet from the actual situs of the activities—would be regular and frequent exposure sufficient to cause development of mesothelioma.  Dr. Moline then cited to scientific literature that asbestos levels were not limited to simply the situs of the work activities, but were also found in clutch and brake boxes, which Mr. Smeal testified that he handled on a regular basis for more than twelve years.  Given these opinions, I find that a jury could reasonably infer that Mr. Smeal regularly worked within the requisite distance of the "breathing zone" of asbestos activities and was thus subject to a harmful exposure.  Certainly, Defendants are free to present contrary expert opinions and to question Dr. Moline on the foundations of her report.  Based on the evidence before me, however, I find that Dr. Moline's report is sufficient to raise a genuine issue of material fact as to causation.

## IV.    CONCLUSION

As I find that Plaintiff has produced sufficient evidence to create genuine issues of material fact as to both exposure and causation, summary judgment for either party is not proper. Accordingly, I will deny both Motions.  An appropriate Order follows.